**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| ALTICOR INC., a Michigan corporation, and AMWAY CORP., a Virginia corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>BREGENER STORE LLC, a Florida limited liability company, JEAN BREGENER LOUIS, a natural person, and JOHN DOES 1-10,<br><br>Defendants. | Case No. ____________________<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 USC § 1114; 15 USC § 1125(a); TORTIOUS INTERFERENCE, AND RELATED CLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, Alticor Inc. ("Alticor") and Amway Corp. ("Amway") (collectively, "Plaintiffs"), bring this action against defendants Bregener Store LLC ("Bregener Store") and Jean Bregener Louis ("Louis"), (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) common law trademark infringement and unfair competition; (4) unfair competition in violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*; and (5) tortious interference with existing contracts and business relationships. These claims arise from Defendants' misappropriation of Plaintiffs' trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Plaintiffs' trademarks. In support of their Complaint, Plaintiffs allege as follows:

## PARTIES

1. Alticor is a corporation, organized under the laws of the State of Michigan, with its principal place of business located in Ada, Michigan. Alticor is the parent company of Amway

Corp. and the owner of the Amway family of trademarks and all associated intellectual property rights.

2. Amway is a corporation, organized under the laws of the State of Virginia, with its principal place of business located in Ada, Michigan.

3. Bregener Store is a limited liability company organized under the laws of the State of Florida, with its principal address at 6936 NE 2nd Ave., Miami, FL 33138 (the "NE 2nd Avenue Address"). Bregener Store operates or assists in the operation of the online storefront on www.amazon.com ("Amazon") that is currently called[1] "Bregener Store LLC" (the "Infringing Storefront"). The "Bregener Store LLC" storefront has a Merchant ID A13YQI15LUYNSX and can be accessed at https://www.amazon.com/sp?seller=A13YQI15LUYNSX.

4. Bregener Store sells or has sold infringing products bearing Plaintiffs' trademarks through the Infringing Storefront and does business throughout the United States through the Infringing Storefronts, including in Michigan.

5. Louis is natural person who, upon information and belief, resides at 39 NW 64th Terrace, Miami, FL 33150 (the "NW 64th Terrace Address"). Louis operates or assists in the operation of the Infringing Storefront, sells infringing products bearing Plaintiffs' trademarks through the Infringing Storefronts, and does business throughout the United States through the Infringing Storefront, including in Michigan.

6. Corporate records filed for Bregener Store identify the NE 2nd Avenue Address as the principal address for Bregener Store and list Louis as the sole authorized person for Bregener

[1] Amazon allows storefront operators to change the names of their storefront, but every storefront on Amazon is assigned a "Merchant ID" that does not change over time, even if the formal "name" of the storefront is changed.

Store. Corporate documents filed for Bregener Store do not list any other individuals as officers or authorized persons of Bregener Store.

7. Plaintiffs assert claims against Louis in both his individual capacity as well as his capacity as the sole member and officer of Bregener Store.

8. Upon information and belief, Louis in his individual capacity and Bregener Store assist in and are responsible for the operation of and sales of products through the Infringing Storefront.

9. Alternatively, as the sole officer of Bregener Store, Louis directs, controls, ratifies, participates in, or is the moving force behind the acquisition and sale of infringing products bearing Plaintiffs' trademarks by the Bregener Store. Upon information and belief, Louis personally participates in the acquisition and sale of infringing products by Bregener Store. Accordingly, Louis is personally liable for infringing activities carried out by Bregener Store without regard to piercing the corporate veil.

10. Alternatively, on information and belief, Bregener Store follows so few corporate formalities and is so dominated by Louis that it is merely an alter ego of Louis. Accordingly, Plaintiffs are entitled to pierce the corporate veil of Bregener Store and hold Louis personally liable for the infringing activities of Bregener Store.

11. Plaintiffs believe that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Plaintiffs. Therefore, Plaintiffs sue these defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities

of these parties are ascertained, Plaintiffs will seek leave to amend this Complaint accordingly. If Plaintiffs do not identify any such parties, Plaintiffs will dismiss these defendants from this action.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. Plaintiffs' federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and their claims arising under the laws of the State of Michigan are substantially related to their federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

13. This Court has personal jurisdiction over Defendants because Defendants have expressly aimed tortious activities toward the State of Michigan and established sufficient minimum contacts with Michigan by, among other things, advertising and selling substantial quantities of infringing products bearing Plaintiffs' trademarks to consumers within Michigan through highly interactive commercial websites, with knowledge that Plaintiffs are located in Michigan and are harmed in Michigan as a result of Defendants' sales of infringing products to Michigan residents. Defendants know that Plaintiffs are located in and harmed in Michigan, among other reasons, because Plaintiffs have informed Defendants of their location in cease-and-desist letters they sent to Defendants. Plaintiffs' claims arise out of Defendants' substantial and regular sales of infringing products bearing Plaintiffs' trademarks to Michigan residents.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district or, in the alternative, because Defendant is subject to personal jurisdiction in this district.

**FACTUAL ALLEGATIONS**

**Plaintiffs and Their Trademarks**

15. Plaintiffs are worldwide leaders in developing, manufacturing, and providing nutrition, beauty, bath and body, cookware, household, and other products to consumers under various brands, including Amway®, Nutrilite®, and Artistry® (collectively, "Amway products"). Plaintiffs permit Amway products to be sold to U.S. consumers only through Amway.com and through Amway IBOs, which enter into contracts with Amway to be able to sell Amway products.

16. Plaintiffs devote a significant amount of time, energy, and resources toward protecting the value of their brands, products, name, and reputation. By distributing products exclusively through their own website and through Amway IBOs, Plaintiffs ensure the safety, well-being, and satisfaction of consumers and maintain the integrity and reputation of the Amway family of brands. Amway IBOs provide users of Amway products with explanation and guidance about the safe and proper use of Amway products. Amway IBOs are required by their contracts with Amway to exercise strict quality control requirements over the products they sell to consumers. In the highly competitive nutrition and household product market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

17. To promote and protect the Amway family of brands, Alticor has registered numerous trademarks with the United States Patent and Trademark Office. These trademarks include, but not are limited to: AMWAY® (U.S. Trademark Registration Nos. 716,672, 847,709, 4,031,832, 4,199,852, 4,289,794, and 4,481,517), NUTRILITE® (U.S. Trademark Registration Nos. 402,891, 689,389, 2,145,912, 3,535,340, 4,748,189, and 4,478,190), GLISTER® (U.S. Trademark Registration Nos. 1,047,111, 4,946,182, 1,257,319, and 7,264,170), G&H® (U.S. Trademark Registration Nos. 5,306,862, 5,306,861, 5,306,860, 7,316,807, 7,328,082, and

6,412,388), and ARTISTRY® (U.S. Trademark Registration Nos. 856,184, 1,505,505, 1,519,877, and 4,645,525), (collectively, the "Amway Trademarks").

18. Alticor has licensed the Amway Trademarks to various subsidiaries, including Amway.

19. The registration for each of the Amway Trademarks is valid, subsisting, and in full force and effect.

20. Plaintiffs actively use and market all of the Amway Trademarks in commerce.

21. Due to the quality and exclusive distribution of Amway products, and because Plaintiffs are recognized as the sources of high-quality products, the Amway Trademarks have substantial value.

**Online Marketplaces and the Threat They Pose to Plaintiffs' Quality Controls, Reputation, and Goodwill**

22. E-commerce retail sales have exploded over the past decade. From 2009 through the third quarter of 2025, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 16.4%. *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (Dec. 30, 2025), https://fred.stlouisfed.org/series/ECOMPCTSA.

23. In 2024, consumers spent $1.192 trillion on e-commerce sales, a 7.5% increase from 2023. *See* Abbas Haleem, *US Ecommerce Sales in 2024 More than Double those of 2019*, Digital Commerce 360 (Mar. 3, 2025), https://www.digitalcommerce360.com/article/us-ecommerce-sales/. The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2024, United States consumers spent more than $500 billion in ecommerce sales on Amazon and Walmart. *Id.*

24. Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

25. Unlike when purchasing products at a brick-and-mortar store or in interpersonal transactions, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them. Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the brand owner.

26. Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller. As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

27. Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.

28. Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no way to exercise their quality controls over products sold by unauthorized sellers or ensure the products are safe and authentic. A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, some of a brand owner's products are ingested by consumers.

29. The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

30. When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the manufacturer or brand owner. Additionally, the interface design of many online marketplaces causes consumers to falsely believe they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand: [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

31. For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

32. When a customer purchases a product on a marketplace and receives a product that is damaged, defective, expired, soon-to-expire, or of otherwise poor quality, the customer is much more likely to associate that frustration with the brand/manufacturer than the product seller.

33. Online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances about disappointing products: online product reviews. Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see. These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

34. Online product reviews significantly impact a brand's reputation. For instance, research has shown that 42% of online consumers now trust online reviews as much as personal recommendations from friends and family. *Online Reviews Statistics*, Capital One Shopping Research (Jan. 27, 2026), https://capitaloneshopping.com/research/online-reviews-statistics/. Among consumers between eighteen and thirty-four years old, this share increases to 91%. *Id*. Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission ("FTC") has begun suing companies who post fake reviews of their products on online marketplaces. Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, (Feb. 28, 2019), https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC). The FTC has also released guidance to consumers on how to evaluate online reviews for authenticity. *See How to Evaluate Online Reviews*, Federal Trade Commission Consumer Advice (Oct. 2022), https://consumer.ftc.gov/articles/how-evaluate-online-reviews (warning consumers that some companies may provide incentives, such a free product, in exchange for writing a review).

35. Consumers are placing greater trust in negative online reviews of products than their positive counterparts. *See Fake Review Statistics*, Capital One Shopping Research (last updated Sept. 10, 2025), https://capitaloneshopping.com/research/fake-review-statistics/ (estimating that an average of 30% of online reviews are considered fake or inauthentic and 82% of consumers will encounter these fake reviews at least once in a twelve-month period); Sofia Garcia Vargas, *From Trust to Doubt: Why Fake Online Reviews Still Fool Consumers*, University of South Florida Muma College of Business (June 4, 2024), https://www.usf.edu/business/news/2025/06-04-fake-online-reviews-study.aspx (explaining that participants in a series of studies were "substantially more likely" to trust negative reviews than

positive reviews). According to one study, a single negative review on the first page of a product page reduced the likelihood of purchase by the consumer by 42%. Paulo Albuquerque, et al., *How Negative Reviews Affect Online Consumers*, INSEAD Knowledge (Nov. 9, 2023), https://knowledge.insead.edu/marketing/how-negative-reviews-affect-online-consumers. As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

36. Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a brand owner's reputation and goodwill.

**Plaintiffs' Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written By Customers Who Purchased Poor Quality Products from Unauthorized Sellers On Online Marketplaces**

37. Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products or customer service and leave negative reviews on product listings. These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

38. Numerous consumers have written negative reviews of Amway products being offered for unauthorized sale on online marketplaces. In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Amway products low "ratings" and complained of receiving products that were nearly expired, tampered with, unsealed, missing contents, previously used, damaged, allegedly different from what was advertised, or of otherwise poor quality.

39. For example, unauthorized sellers, like Defendants, have sold on Amazon the Amway product seen in the screenshot below:




40. As seen in the following sample screenshots of customer reviews, numerous consumers have left negative reviews of this product complaining of receiving products that were not as ordered or of otherwise poor quality:


tsendayush
**Misleading instructions**
Reviewed in the United States on April 7, 2026
Verified Purchase
Misleading instructions. I bought it because it said 4 packs. But it was only one toothpaste. For this price not worth it buying one toothpaste.
8 people found this helpful
Helpful | Report

Elena
**You're not getting what you ordered**
Reviewed in the United States on April 12, 2026
Verified Purchase
It said that four tubes were being sold, but when only one tube arrived, I was very surprised by this deception
2 people found this helpful
Helpful | Report

Tsatsral
**High price**
Reviewed in the United States on April 7, 2026
Verified Purchase
I really like this toothpaste, but I ordered 4 and only received 1. Be careful — this seller is taking orders inaccurately.
3 people found this helpful
Helpful | Report

Cliente de Amazon

★☆☆☆☆ **Scam**

Reviewed in the United States on April 7, 2026

Verified Purchase

Scam. Price, picture and description all imply 4 toothpaste boxes. Only received one.

2 people found this helpful

Helpful | Report

41. Below is a screenshot of another Amway product listed for sale on Amazon by unauthorized sellers, like Defendants:

Health & Household › Oral Care › Toothpaste




Glister Multi-Action Fluoride Toothpaste 6.75 Ounce. (6-Pack)

Brand: Glister

4.6 ★★★★☆ (1,560)

**100+ bought** in past month

$80.00 ($1.98 / ounce)

Get $50 off instantly: Pay $30.00 ~~$80.00~~ upon approval for Amazon Visa. No annual fee.

Available at a lower price from other sellers that may not offer free Prime shipping.

Flavor Name: **Unflavored**

Size: **6.75 Ounce (Pack of 6)**

**Top highlights**

**Item details**

**Features & Specs**

See all product specifications

Report an issue with this product or seller

$80.00 ($1.98 / ounce)

FREE delivery **Friday, August 14.** Details

Or fastest delivery **August 11 - 12.** Details

Delivering to St Louis 63169 - Update location

In Stock

Quantity: 1

Add to cart

Buy Now

Shipper / Seller: Bregener Store LLC

Returns: Non-returnable due to Food safety reasons

Payment: Secure transaction

Add to List

42. As seen in the following sample screenshots of customer reviews, numerous consumers have left negative reviews of this product complaining of receiving products that were not as ordered, tampered with, nearly expired, delivered without critical safety components, such as safety seals, or of otherwise poor quality:

Sorin Stratu

★☆☆☆☆ **Concerns About Product Authenticity**

Reviewed in the United States on February 18, 2026

Flavor Name: Unflavored | Size: 6.75 Ounce (Pack of 6) | Verified Purchase

I'm concerned about this order. The tubes were not sealed, and the product identification numbers appear to have been removed from all of them. This makes me question the authenticity of the product.



Helpful | Report

Vasyl Broshko

★☆☆☆☆ **The product does not correspond to reality**

Reviewed in the United States on September 22, 2024

Flavor Name: Unflavored | Size: 6.75 Ounce (Pack of 6) | Verified Purchase

The product does not correspond to reality at all, different weights and different weights are indicated on the same pastes. the product does not correspond to reality at all, and the seller noted that it is not subject to return. so be careful and never order here!



One person found this helpful

Helpful | Report

Tee Cee

★☆☆☆☆ **Not the same as it was in the past.**

Reviewed in the United States on December 20, 2025

Flavor Name: Unflavored | Size: 6.75 Ounce (Pack of 6) | Verified Purchase




No safety seal.



2 people found this helpful

Helpful | Report

Franklyn M

★☆☆☆☆ **Completely FALSE**

Reviewed in the United States on October 17, 2023

Flavor Name: Unflavored | Size: 6.75 Ounce (Pack of 6) | Verified Purchase

This product is a total scam, it is blatant stealing... it says it has a net weight of 6.75 ounces and in reality it only weighs 1.6 ounces, and then when I wanted to return it Amazon simply said that this item cannot be returned

One person found this helpful

Helpful | Report

fkebay

★☆☆☆☆ **Items expire in a month and can't return!**

Reviewed in the United States on May 7, 2024

Flavor Name: Unflavored | Size: 6.75 Ounce (Pack of 6) | Verified Purchase

Got the items with 6 tubes of toothpaste in May but noticed expiration date is next month!! This is ridiculous. I attempted to the return but this product is not qualify!!

One person found this helpful

Helpful | Report

43. Below is a screenshot of another Amway product listed for sale on Amazon by unauthorized sellers, like Defendants:




44. As seen in the following sample screenshots of customer reviews, numerous consumers have left negative reviews of this product complaining of receiving products that were opened, tampered with, empty, or of otherwise poor quality:






Amazon Customer
★☆☆☆☆ **EMPTY - ZERO STARS!**
Reviewed in the United States on April 28, 2024
Verified Purchase
I ordered this for my mom and it arrived used and empty. Absolutely disgusting and horrible.



One person found this helpful
Helpful | Report

45. The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Amway products listed on the Amazon website by unauthorized sellers like Defendants.

46. Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review. Given that Defendants have sold a high volume of products bearing the Amway Trademarks on Amazon and are not subject to Plaintiffs' quality controls, however, it is likely that some of the foregoing negative reviews and ratings were written by customers who purchased products bearing the Amway Trademarks from Defendants.

**Plaintiffs Prohibit Sales on Online Marketplaces, Exercise Strict Quality Controls Over the Production and Distribution of Amway Products, and Provide a Guarantee for Products Purchased from Amway IBOs**

47. To maintain quality controls over Amway products, Plaintiffs allow Amway products to be sold in the United States only by Plaintiffs themselves (through Amway.com) or by Amway IBOs.

48. Because of the threats to their goodwill and consumer safety that are caused by sales on online marketplaces, as discussed above, Plaintiffs do not sell Amway products on any online marketplace and strictly prohibit Amway IBOs from selling Amway products on any online marketplace.

49. Amway IBOs must enter into contracts with Amway to be permitted to sell Amway products. These contracts authorize Amway IBOs to sell Amway products only in certain channels

and require Amway IBOs to provide various customer services and exercise various quality controls over Amway products (collectively, the "Amway Rules"). Amway enforces the quality controls established in the Amway Rules and its contracts with Amway IBOs, and its ability to maintain quality controls is essential to the integrity and safety of Amway products, the value of the Amway Trademarks, and the safety and satisfaction of consumers.

50. The Amway Rules expressly prohibit Amway IBOs from selling Amway products on the Internet unless they use an authorized Amway.com platform.

51. The Amway Rules require, among other customer service requirements and protections, that Amway IBOs provide customers with vital information regarding Amway products and their uses. This person-to-person interaction between Amway IBOs and their customers allows for explanation and guidance on the safe and proper use of Amway products. To this end, the Amway Rules prohibit Amway IBOs from selling or displaying Amway products in retail establishments.

52. Under the Amway Rules, Amway IBOs must also provide personal services to customers concurrently with and after their sales. Amway IBOs have access to literature and other educational materials developed to advise customers on each product's purpose, features, and benefits. Amway IBOs are therefore uniquely qualified to explain best practices for safe and optimal use of Amway products, and these services of course cannot be provided by non-Amway IBOs who sell Amway products.

53. Amway IBOs are also trained and instructed to present only complete and truthful information about Amway's products and services, and must refer only to the statements permitted in authorized literature. It is essential to consumer well-being and Plaintiffs' reputation that customers are able to make fully informed decisions about whether to purchase Amway products

and which products to purchase. The Amway Rules prohibit Amway IBOs from providing misleading or false information to customers, and Amway monitors its Amway IBOs to ensure that Amway IBOs do not violate these prohibitions.

54. To ensure that customers receive products of the quality they have come to expect from Plaintiffs, Amway IBOs are prohibited from altering any Amway product, label, or accompanying literature. Amway IBOs may sell Amway products only in their original packaging and formulation to prevent customer confusion and erosion in the quality and value of Amway products. Amway IBOs must explain to customers that Amway products are safest when used as directed on the product labels.

55. Amway IBOs must also follow storage and handling requirements for all Amway products, including storing products in a cool, dry place and ensuring that products are never exposed to freezing temperatures. Numerous Amway products are permanently damaged if they are allowed to freeze.

56. Amway tracks all purchases of Amway products from Amway.com and from Amway IBOs, so that it can conduct a recall or disseminate other important consumer safety information in the event that a quality control issue arises. Amway is not able to track products that are sold outside of authorized channels and, thus, unable to alert customers who purchased from unauthorized sellers if a quality issue arises.

57. For all of these reasons, Plaintiffs limit third party sales of their products to Amway IBOs who have access to, and must follow, the Amway Rules. By so limiting their sales, Plaintiffs are able to protect the safety of their consumers and maintain the integrity and reputation of the Amway family of brands.

58. Amway also prohibits Amway IBOs from selling Amway products to persons or entities that Amway IBOs know, or have reason to know, are going to resell those products on the Internet (including on Amazon). The purpose of this restriction is to ensure that Amway products are sold to consumers only by Plaintiffs themselves or by Amway IBOs who are subject to and follow Plaintiffs' quality controls.

59. Amway also provides customers who purchase Amway products through authorized chains of distribution with the Amway Satisfaction Guarantee ("Satisfaction Guarantee"), which allows customers who are not completely satisfied with an Amway product to receive a refund or product replacement within 180 days of purchase. Customers who purchased Amway products from Amway IBOs are given a full refund, credit, or a product exchange by the Amway IBO from whom they purchased their product. Customers who purchased products from Amway.com may return their products to Amway, in accordance with return instructions on their product's official packing slip.

60. Amway offers the Satisfaction Guarantee only for products that were sold by sellers who are subject to Plaintiffs' quality controls and have agreed to follow their quality controls—specifically, Amway IBOs and Plaintiffs themselves. Because non-Amway IBOs are not subject to Plaintiffs' quality controls and Amway cannot therefore ensure the quality of products sold by non-Amway IBOs, the Satisfaction Guarantee is not available for Amway products purchased from any third party who is not an Amway IBO.

**Amway's Discovery of Defendants' Sales of Amway Products on the Internet**

61. Because the unauthorized sale of Amway products over the Internet threatens the safety of consumers and the reputation and goodwill associated with the Amway Trademarks, Amway actively monitors the sale of Amway products online.

62. Through these efforts, Amway discovered that high volumes of products bearing the Amway Trademarks were being sold on Amazon through the storefront called "Bregener Store LLC."

63. The "Bregener Store LLC" storefront currently lists the "Business Name" for the storefront as "Jean Bregener Louis" and it lists the "Business Address" as the NW 64th Terrace Address:

**Detailed Seller Information**

**Business Name:** Jean Bregener Louis
**Business Address:**
39 NW 64TH TER
MIAMI
FL
33150-4513
US

64. The "Bregener Store LLC" storefront used to list the "Business Address" as the NE 2nd Avenue Address.

65. Through investigation, Plaintiffs discovered that there is a limited liability company organized under Florida law called "Bregener Store LLC."

66. The articles of organization for Bregener Store were filed on January 9, 2025. The articles, as well as an April 15, 2026 annual report, list the mailing address for Bregener Store as the NE 2nd Avenue Address and list Louis as the sole authorized person. The articles also list Louis as the individual who registered the entity, and do not list any other individuals as members or officers of Bregener Store.

67. On or around September 2, 2025, counsel for Plaintiffs sent cease-and-desist letter to Bregener Store and Louis for the operation of the Infringing Storefront. Plaintiffs' letter explained that Defendants were infringing on the Amway Trademarks through their online sales

and causing harm to Plaintiffs. Plaintiffs' letter also explained that Amway IBOs are not permitted to sell Amway Products on online marketplaces, including on Amazon. Plaintiffs' letter demanded that Defendants permanently cease selling products bearing the Amway Trademarks and disclose all sources that provided Defendants with the products they had listed for sale on the "Bregener Store LLC" Amazon storefront.

68. On or around September 29, 2025 and October 27, 2025, Plaintiffs sent follow-up letters to Bregener Store and Louis, one of which included a draft complaint, reiterating Plaintiffs' demands in its initial cease-and-desist letter.

69. Defendants did not respond to any of Plaintiffs' letters and continued to offer for sale and sell infringing products bearing the Amway Trademarks.

70. On March 30, 2026, counsel for Plaintiffs sent Defendants a final cease-and-desist letter, warning Defendants that Plaintiffs intended to file the instant lawsuit in this Court if Defendants did not cease their unlawful conduct. This cease-and-desist letter also reminded Defendants that Plaintiffs are located in and harmed in Michigan and that Defendants' conduct subjects them to personal jurisdiction in this Court.

71. As of the time of filing, Defendants have not responded to any of the communications sent by Plaintiffs' counsel and have continued to advertise and sell products bearing the Amway Trademarks through their Amazon Storefront without any abatement. Defendants' disregard of Plaintiffs' cease-and-desist letters and communications and their continued sales of non-genuine products demonstrate that Defendants are acting intentionally, willfully, and maliciously.

72. Defendants have sold a high volume of infringing products bearing the Amway Trademarks through the Amazon Storefront.

73. Upon information and belief, through their storefront on the highly interactive Amazon website, Defendants accept and fulfill orders from Michigan residents for products bearing the Amway Trademarks and cause substantial quantities of infringing products bearing the Amway Trademarks to be shipped to persons located in Michigan through the regular course of business. Defendants have taken no steps to prevent persons located in Michigan from purchasing products from any of the Infringing Storefront.

**Defendants Are Infringing the Amway Trademarks by Selling Products Bearing The Amway Trademarks That Are Not Subject To, Do Not Abide By, and Interfere with Plaintiffs' Quality Control and Customer Service Requirements**

74. Defendants, without authorization from Plaintiffs, have sold products bearing the Amway Trademarks through their Infringing Storefront. Defendants may also be selling products through additional storefronts on Amazon or other channels that Plaintiffs have not yet discovered, and cannot discover until they are able to take discovery.

75. Plaintiffs have implemented quality control and customer service requirements throughout their authorized channels of distribution. The products sold by Defendants are not genuine Amway products because they are not subject to, and interfere with, Plaintiffs' quality control and customer service requirements that Amway IBOs must follow.

76. Plaintiffs' quality control and customer service requirements are legitimate and substantial. As a result of Defendants' sales of products that are not subject to these requirements, Plaintiffs have lost control of the quality of goods that bear their trademarks. For example, Plaintiffs have no control over whether Defendants carry out the storage and handling requirements that Amway IBOs are required to follow or whether Defendants sell products that are damaged, defective, repackaged, or otherwise altered.

77. Defendants are also interfering with Plaintiffs' quality control and customer service requirements, among other ways, because Plaintiffs cannot track or conduct a recall of products that Defendants sell to consumers. Defendants also do not advise—and are not capable of advising—customers about product information and best practices for safe and optimal use of Amway products because, as non-Amway IBOs, Defendants do not have access to the approved literature and other educational materials that Amway IBOs are given to perform these services.

78. Customers have written reviews of Defendants' Amazon Storefronts in which they complained of receiving wrong products, the incorrect quantity of products, and products in damaged packaging. Although Amazon has added comments to some of these complaints taking responsibility for the actions described in the complaints, the problems that consumers address in these reviews are clearly the fault of Defendants rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants, as examples:

"The package was wrapped three times but the original boxes of products were damaged and the container of products were damaged as well. Also the products' is going to expired September of this year.. I didn't expect to use each over 6 ounce of toothpaste each months."

Read less

By alice kim on March 18, 2026.

"The order discription says 2 pack,and paid for 2 pack,but we received one"

By Rajesh kumar on February 14, 2026.

"seller canceled order to raise price...it was $15.50 for 12 canisters and i ordered a total of 3 at that price....now it is $30.50....so a bait and switch in hopes I would reorder at the higher posted price"

Read less

By Amazon Customer on February 21, 2025.

"Hi I ordered 4 of them i only received one bottle what's going please I want the other 3 bottles please plus the color i ordered that's not the one the send only one bottle is a gold color i ordered the orange color please i need my money or those stuff I order please thank"

Read less

By jessica.love on January 4, 2025.

"~~Seller Sucks! Didn't send Items and wouldn't replace! They also doubled the price of the items....What a racket!~~"

By Rusty D Gates on March 10, 2025.

**Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

"~~Bait and switch price and shipping tactics. Gave a tracking number, but the item never came.~~"

By Nikola Ghanty on March 11, 2025.

**Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

"~~Will not deliver, do yourself a favor and buy from a different seller~~"

By Bryan Ellis on April 8, 2025.

**Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

79. Additionally, Plaintiffs conducted a test purchase of an Amway product from the "Bregener Store LLC" storefront and received a product in crumpled, dented, and damaged packaging.

80. A significant reason why Plaintiffs allow Amway products to be sold only by Amway IBOs who are subject to Amway's quality controls and prohibit Amway IBOs from selling products on online marketplaces is to prevent customers from suffering experiences like those described in the negative reviews of Defendants' Amazon Storefront and identified through Plaintiffs' test purchase.

81. These reviews, along with the numerous negative customer reviews of Amway products that Defendants have sold, *see supra* ¶¶ 39-46, show that Defendants are very likely not carrying out the quality control inspection, storage, or handling requirements that Amway requires Amway IBOs to follow for Amway products. Instead, Defendants are likely selling products bearing the Amway Trademarks to consumers that are damaged, tampered with, unsealed, missing contents, previously used, expired, or otherwise different from what was advertised. These sales cause customers to write highly negative reviews of Amway products that harm Plaintiffs' reputation.

82. For all of these reasons, the products being sold by Defendants are also not genuine Amway products because they do not abide by Plaintiffs' quality control and customer service requirements that Amway IBOs must follow.

83. Through their unauthorized use of the Amway Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Amway products. In reality, however, the products sold by Defendants are materially different from genuine Amway products because they are not subject to, do not abide by, and interfere with Plaintiffs' quality control and customer service requirements.

**Defendants Are Infringing the Amway Trademarks by Selling Products Bearing The Amway Trademarks That Do Not Come With the Amway Satisfaction Guarantee**

84. As set forth above, Amway products purchased from Plaintiffs or Amway IBOs come with the Amway Satisfaction Guarantee. Amway, however, does not provide the Satisfaction Guarantee for products purchased from any third party who is not an Amway IBO because Amway cannot ensure the quality of products sold by sellers that are not subject to Plaintiffs' quality controls.

85. Because Defendants are not Amway IBOs and, thus, are not subject to Plaintiffs' quality control requirements, the products bearing the Amway Trademarks that Defendants sell do not come with the Satisfaction Guarantee.

86. Because the products that Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine Amway products.

87. The Satisfaction Guarantee is a material element of genuine Amway products. Consumers considering whether to purchase Amway products would find it relevant to their purchasing decision to know whether the product they are purchasing is eligible for the Satisfaction

Guarantee. Consumers who purchase Amway products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Amway stands behind the product, and that they will have 180 days to get a refund, credit, or product replacement if they are dissatisfied with their product for any reason.

88. Defendants' unauthorized sale of products bearing the Amway Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Amway products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With Amway's Contracts and Business Relationships With Amway IBOs**

89. As noted above, Plaintiffs sell Amway products to U.S. consumers exclusively through Amway.com and through Amway IBOs.

90. Amway has entered into contracts with all of its Amway IBOs that prohibit Amway IBOs from selling Amway products to persons or entities that Amway IBOs know, or have reason to know, are going to resell the products on the Internet.

91. Defendants have sold and are continuing to sell a very high volume of products bearing the Amway Trademarks on the Internet. The only plausible way that Defendants could be obtaining the volume of products they have sold is by purchasing them from one or more Amway IBOs. Thus, upon information and belief, Defendants have purchased products from Amway IBOs for the purpose of reselling them on the Internet.

92. Amway's contracts with its Amway IBOs are a specific class of contract that Defendants are causing Amway IBOs to breach when Defendants purchase Amway products from Amway IBOs. Although Plaintiffs do not yet know which specific Amway IBO(s) have breached their contracts with Amway—and indeed cannot learn this information with certainty until they

are able to take discovery from Defendants—Defendants know how Defendants obtained the products they have sold and are on notice of the basis for Plaintiffs' claim of tortious interference.

93. By purchasing Amway products from Amway IBOs and then reselling them on the Internet, Defendants caused and induced Amway IBOs to breach their contracts with Amway.

94. Defendants have known that Amway's contracts with Amway IBOs prohibit Amway IBOs from selling Amway products to third parties, such as Defendants, who the Amway IBOs know or have reason to know are going to resell the products on the Internet.

95. Defendants have known of this prohibition because Plaintiffs notified Defendants of the prohibition in, at least, the September 2, 2025 letter.

96. Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Amway's contracts with its Amway IBOs by inducing Amway IBOs to breach their contracts and sell Amway products to Defendants that Defendants resold on Amazon.

97. In interfering with Amway's contracts, Defendants acted without justification and with a wrongful purpose. Defendants purchased Amway products from Amway IBOs—and in so doing, instigated a breach of the Amway IBOs' contracts with Amway—so that Defendants could unlawfully infringe upon and materially damage the value of the Amway Trademarks by reselling the products on the Internet, thereby committing an independent tort.

98. Defendants are not parties to the contracts that Defendants caused Amway IBOs to breach.

99. If Plaintiffs learn through discovery that Defendants somehow did not obtain from any Amway IBO any of the Amway products that Defendants have sold on the Internet, Plaintiffs will dismiss their claim for tortious interference.

**Plaintiffs Have Suffered Substantial Harm As A Result of Defendants' Conduct**

100. As set forth above, the unauthorized sale of products bearing the Amway Trademarks by unauthorized sellers such as Defendants has caused significant harm to the Amway family of brands.

101. When a consumer receives a non-genuine, damaged, or otherwise poor quality or materially different product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Plaintiffs. As such, Defendants' ongoing sale of non-genuine products bearing the Amway Trademarks harms Plaintiffs and their brands.

102. As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, significant monetary harm including, but not limited to, loss of sales, damage to the value of their intellectual property, harm to the goodwill associated with the Amway family of brands, and damage to their existing and potential business relations.

103. Plaintiffs are entitled to injunctive relief because Defendants will otherwise continue to unlawfully sell products bearing the Amway Trademarks that are materially different from genuine Amway products sold by Amway IBOs and are outside of Plaintiffs' quality controls, thereby compromising Plaintiffs' quality controls. Defendants' ongoing illegal conduct has caused and will continue to cause irreparable harm to Plaintiffs' reputation, goodwill, business relationships, intellectual property, and brand integrity.

104. Additionally, Plaintiffs are entitled to injunctive relief requiring Defendants to return or destroy infringing products because, without that remedy, Defendants may evade injunctive relief by transferring their infringing products to another reseller.

105. Defendants' conduct was and is knowing, intentional, willful, malicious, wanton, and contrary to law.

**COUNT I**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)**

106. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

107. Plaintiffs are the owner and licensee of the Amway Trademarks.

108. Alticor has registered the Amway Trademarks with the United States Patent and Trademark Office.

109. The Amway Trademarks are valid and subsisting trademarks in full force and effect.

110. Defendants have willfully and knowingly used, and continue to use, the Amway Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

111. The products bearing the Amway Trademarks that Defendants sell are not authorized for sale by Plaintiffs.

112. Defendants' use of the Amway Trademarks in connection with Defendants' unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

113. Defendants' use of the Amway Trademarks in connection with Defendants' unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

114. The products sold by Defendants are not, in fact, genuine and authentic Amway products. The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Amway's quality control requirements that Amway IBOs must follow.

115. Defendants' unauthorized use of the Amway Trademarks has materially damaged the value of the Amway Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Trademarks.

116. As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

117. Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Amway Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

118. Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

119. Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Amway Trademarks.

## COUNT II
## Unfair Competition
## 15 U.S.C. § 1125(a)(1)(A)

120. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

121. As set forth above, Defendants are selling non-genuine products bearing the Amway Trademarks that are materially different from genuine Amway products.

122. Defendants' sale of non-genuine products bearing the Amway Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Plaintiffs when they are not.

123. Defendants' sale of non-genuine products bearing the Amway Trademarks is likely to cause consumer confusion and lead consumers to believe that the products are genuine Amway products when they are not.

124. Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

125. Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

126. Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

## COUNT III
## Common Law Trademark Infringement and Unfair Competition

127. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

128. This claim arises under the laws of the State of Michigan.

129. Plaintiffs are the owner and licensee of the Amway Trademarks.

130. Alticor has registered the Amway Trademarks with the United States Patent and Trademark Office.

131. The Amway Trademarks are valid and subsisting trademarks in full force and effect.

132. Defendants have willfully and knowingly used, and continue to use, the Amway Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

133. The products bearing the Amway Trademarks that Defendants sell are not authorized for sale by Plaintiffs.

134. Defendants' use of the Amway Trademarks in connection with Defendants' unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

135. Defendants' use of the Amway Trademarks in connection with Defendants' unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

136. The products sold by Defendants are not, in fact, genuine and authentic Amway products. The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Amway's quality control requirements that Amway IBOs must follow.

137. Defendants' unauthorized use of the Amway Trademarks has materially damaged the value of the Amway Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Trademarks.

138. As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

139. Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Amway Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

140. In harming Plaintiffs, Defendants have acted with willful misconduct and actual malice. Accordingly, Plaintiffs are entitled to an award of exemplary damages.

**COUNT IV**
**Unfair Competition In Violation of Michigan Consumer Protection Act**
**Mich. Comp. Laws §§ 445.901, et seq.**

141. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

142. Defendants' use of the Amway Trademarks in connection with Defendants' unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

143. Defendants' use of the Amway Trademarks in connection with Defendants' unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

144. The products sold by Defendants are not, in fact, genuine and authentic Amway products. The products sold by Defendants are materially different because, among other reasons,

they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Amway's quality control requirements that Amway IBOs must follow.

145. Defendants' unauthorized use of the Amway Trademarks has materially damaged the value of the Amway Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Trademarks.

146. Defendants' actions constitute an unfair or deceptive sales practice as described in Michigan Consumer Protection Act, §§ 445.901, et seq.

147. In harming Plaintiffs, Defendants have acted with willful misconduct and actual malice. Accordingly, Plaintiffs are entitled to an award of exemplary damages.

**COUNT V**
**Tortious Interference with Existing Contracts and Business Relationships**

148. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

149. This claim arises under the laws of the State of Michigan.

150. Plaintiffs sell Amway products to U.S. consumers exclusively through Amway.com and through Amway IBOs.

151. Amway has entered into contracts with Amway IBOs that prohibit Amway IBOs from selling Amway products to persons or entities that Amway IBOs know, or have reason to know, are going to resell the products on the Internet.

152. Defendants have sold and are continuing to sell a very high volume of products bearing the Amway Trademarks on the Internet. The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Amway IBOs.

153. By purchasing products from Amway IBOs and then reselling them on the Internet, Defendants caused and induced Amway IBOs to breach their contracts with Amway.

154. Defendants have known that Amway's contracts with Amway IBOs prohibit Amway IBOs from selling Amway products to third parties, such as Defendants, who the Amway IBOs know or have reason to know are going to resell the products on the Internet.

155. Defendants have known of this prohibition because Plaintiffs notified Defendants of it in, at least, Plaintiffs' September 2, 2025 letter.

156. Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Amway's contracts with its Amway IBOs by inducing Amway IBOs to breach their contracts and sell products to Defendants that Defendants resold on Amazon.

157. In interfering with Amway's contracts, Defendants acted without justification and with a wrongful purpose. Defendants purchased Amway products from Amway IBOs—and in so doing, instigated a breach of the Amway IBOs' contracts with Amway—so that Defendants could unlawfully infringe upon and materially damage the value of the Amway Trademarks by reselling the products on the Internet, thereby committing an independent tort.

158. Defendants were not parties to the contracts that Defendants caused Amway IBOs to breach.

159. Defendants' actions have caused injury to Plaintiffs for which Plaintiffs are entitled to compensatory damages in an amount to be proven at trial.

160. Plaintiffs are entitled to recover exemplary damages because Defendants have acted with malice and willful and wanton misconduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Judgment in favor of Plaintiffs and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, treble damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest, as permitted by law;

B. An accounting of Defendants' profits from their sales of infringing products bearing the Amway Trademarks;

C. A permanent injunction enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i) Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Amway Trademarks;

ii) Prohibiting the Enjoined Parties from using any of the Amway Trademarks in any manner, including advertising on the Internet;

iii) Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Amway products as well as any products bearing any of the Amway Trademarks;

iv) Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Amway Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v) Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any Amway products or any of the Amway Trademarks;

vi) Requiring the Enjoined Parties to take all action, including but not limited to, requesting Internet search engines (such as Google, Yahoo!, and Bing) to remove from the Internet any of the Amway Trademarks which associate Amway products or the Amway Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii) Requiring the Enjoined Parties to take all action to remove the Amway Trademarks from the Internet, including from the website www.amazon.com

viii) Requiring the Enjoined Parties to take all action to remove, or cause to be removed, any customer reviews of products bearing the Amway Trademarks that were sold by Defendants on third-party marketplace websites including, but not limited to www.amazon.com; and

ix) Requiring Defendants to destroy or return to Plaintiffs all products bearing the Amway Trademarks in Defendants' possession, custody, or control.

D. An order requiring Amazon.com, Inc. and eBay Inc. to freeze all funds in any accounts owned or controlled by Defendants;

E. An award of attorneys' fees, costs, and expenses; and

F. Such other and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 2, 2026

Respectfully submitted

*/s/ Kent A. Britt*
Kent A. Britt (Ohio Bar No. 0068182)
VORYS, SATER, SEYMOUR AND PEASE LLP
301 E. 4th Street, Suite 3500
Cincinnati, Ohio 45202
(513) 723-4488
kabritt@vorys.com

Edward J. Bardelli (P53849)
WARNER NORCROSS + JUDD LLP
1500 Warner Bldg.

150 Ottawa Ave, NW
Grand Rapids, Michigan 49503
(616) 752-2165
ebardelli@wnj.com

Emma Morehart (Ohio Bar No. 0098085)
(*pro hac vice forthcoming*)
VORYS, SATER, SEYMOUR AND PEASE LLP
301 E. 4th Street, Suite 3500
Cincinnati, Ohio 45202
(513) 723-4036
ekmorehart@vorys.com

***Attorneys for Plaintiffs Alticor Inc. and Amway Corp.***